D. Blair Clark
LAW OFFICES OF D. BLAIR CLARK PC
967 E. Parkcenter Blvd., #282
Boise, ID 83706
Phone: (208) 475-2050
Fax: (208) 475-2055
Email: dbc@dbclarklaw.com
Idaho State Bar No. 1367
Attorneys for Debtor/Plaintiff

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| In re: <br><br> **IDC ENTERPRISES, INC.** <br><br> Debtor. | Case No. **20-20081-TLM** |
| **IDC ENTERPRISES, INC., an Idaho Corporation,** <br><br> Plaintiff, <br><br> vs. <br><br> **VIKING LUMBER COMPANY, INC. an Alaska Corporation,** <br><br> Defendant. | Adversary No. <br><br> **COMPLAINT** |

COMES NOW the Plaintiff, and complains and alleges as follows:

COMPLAINT—Page 1

JURISDICTION AND VENUE:

1.  Jurisdiction arises under 28 USC §1334.  This is an action to recover property of the bankruptcy estate and is a core proceeding under 28 USC §157.  Defendant has filed a Proof of Claim in this case, being Claim No. 8, and has thereby consented to jurisdiction and venue in this Court.  To the extent necessary, Plaintiff requests that the Court determine the allowance of the claim as well as the "nature, extent and priority" of any lien claimed in their Proof of Claim.

2.  To the extent the issues are non-core, Plaintiff consents to judgment by the Bankruptcy Judge.

3.  Venue is proper in this District under 11 USC §1408, as this District is the one in which the case under Title 11 is pending.

4.  Plaintiff is an Idaho corporation.  Defendant is an Alaska corporation.

BREACH OF CONTRACT:

5.  In September, 2018, Kirk Dahlstrom, the secretary/treasurer of Defendant, contacted Jason Lunders, president of Plaintiff, to retain Plaintiff to perform portions of a large logging operation for Defendant on several units in the "Rough Luck" timber sale and another one for a unit owned by the Alaska Mental Health Department.  Together, these two projects were anticipated to yield 10-12 years of work for Debtor, as Defendant so represented.  Mr. Lunders was advised that Viking would be upping their annual production to over 32 million board feet.

6.  Mr. Lunders went to Alaska to meet with Dahlstrom and view the project.  There were several units in the "Rough Luck" sale, and four of them had cut timber that

COMPLAINT—Page 2

needed to be logged out.   Lunders was advised by Dahlstrom that they were to log approximately 25-32 million board feet annually, with 10-12 million board feet from the Alaska Mental Health property for the next ten years.   Dahlstrom also showed Lunders several pieces of equipment and vehicles that Viking had agreed to purchase, which they would then sell to Plaintiff so it could begin logging on these projects.

7.     The phases for the projects were divided among various contractors, so that one contractor (Morrow) would cut and fall the trees, de-limb them, and cut them into log-sized lengths ('bucking').   Another contractor (Papac) would build the logging roads needed, along with the temporary roads, and then do the work needed to reclaim the property and remove the roads when done.   Plaintiff's task was to construct trails for the equipment, hook or pick up the cut and bucked logs, and get them to the roads to be loaded and hauled.   Viking would provide the trucking to the mills, scale and process the logs, and pay the contractors for their work and labor on the jobs.

8.     On or about October 1, 2018, Plaintiff and Defendant entered into agreements for performance of the agreed-upon work in Alaska, to be done on behalf of Defendant. Contracts were both for Debtor and for its principal, Jason Lunders, "dba IDC Enterprises, Inc."   Plaintiff does not know why there were two contracts but the copies thereof are true and correct, and were done on behalf of Plaintiff.

9.     Pursuant to the agreements between the parties, Plaintiff caused several expensive, large pieces of logging equipment to be shipped to the site from Idaho through Seattle by barge, and at substantial cost and expense, in order to properly prepare for performance of the contract.   Defendants did advance some of these

shipping costs, but the bulk of them were incurred by Plaintiff. Moreover, Plaintiff will incur substantial cost of over $82,000 in returning these items to the mainland, being $52,000 to hire the barge from Prince of Wales Island to Seattle and $30,000 in addition to bring it to Idaho.

10. Plaintiff began to do its agreed-upon work and performed it to the best of Plaintiff's ability, but was unable to work full time due to the failure of the Defendant to comply with its obligations to Plaintiff under the contract.

   a. Defendant never provided sufficient trucking to haul the logs as required. Plaintiff often would have 20 or more loads ready to go on a daily basis, and Defendant would usually not be able to haul more than 10 loads per day, if that. Defendant continued to assure Plaintiff that they would have sufficient trucking available but those representations proved untrue.

   b. In January, 2019, after several discussions between Plaintiff and Defendant's representatives, it was agreed that on January 17, there would be five trucks available. Plaintiff thereupon had two operators and loaders prepared for the trucks at 5:00 AM pursuant to the promises made. Plaintiff had sufficient timber and personnel on site to load 20 loads that day, but only two loads actually were trucked out of the site. The same occurrence happened on January 20; Plaintiff could have loaded 20 loads but in reality, only loaded 6 because of the lack of trucks. On January 22, Mr. Lunders hauled two loads himself on Plaintiff's truck to help the situation, but was told by Defendant that he could not haul any more logs himself. The total from January 16-30 was 48 loads hauled where it should

have been 175 loads or more.  From February 1-15, Viking only hauled 4 loads total.  Plaintiff could have 20 loads per day to be loaded out; at one time, Plaintiff had 500 loads waiting to be hauled.

c. Plaintiff had to reduce its number of employees to cut its overhead and had its employees doing other jobs simply to keep busy.  At this time, Plaintiff had approximately 225 loads of logs ready to load and be hauled, but there were no trucks being sent.  Plaintiff learned that Defendant was shipping its trucks to other jobs, especially those being logged by a company in which Dahlstrom has a financial ownership interest.  Defendant breached the contract with Plaintiff by so doing.

d. It was also Defendant's responsibility to assure that there was sufficient timber cut to allow Plaintiff's to perform its tasks properly.  However, over the course of performance, the cutting slowed and gradually ceased at times.  Plaintiff picked up all of the timber that was cut and available, performed its jobs, and caught up to the cutters.  During this period of time, sometimes there would only be one or two men with chainsaws doing the cutting, which would only produce approximately 3-6 loads per day.

e. Plaintiff had people waiting in camp to work on the logging project, causing Plaintiff to bear the full cost of lodging and subsistence for the crew members and allowing them to be ready for work, but Defendant simply had inadequate work available since they did not have timber cut.  Plaintiff made several email and text message protests, besides oral protests, to no avail.

COMPLAINT—Page 5

11.     Plaintiff had conversations with the Forest Service about the jobs to assure they were in compliance with the requirements of the contract, and was assured they were performing satisfactorily, including in the meeting of the production goals.   Plaintiff was continually requested by Defendant's employees and managers to make sure the mills had logs coming in so they could generate output, while at the same time, Plaintiff's logs remained on-site too long because Defendant was not meeting its obligations to haul the logs to the Defendant's own mill.

12.     In July, 2019, Kirk Dahlstrom, Defendant's representative, purportedly terminated Plaintiff because of "poor production."

13.     The termination was a breach of the contract between the parties, for which Plaintiff is entitled to damages for all of the timber scaled and not hauled; for all of the timber not able to be processed due to the unlawful termination; and for Defendant's failure to haul the timber that was properly prepared, all to Plaintiff's damage in such amount as may be proved at trial.

14.     Plaintiff was assured that Defendant would provide trucking for 350 to 520 loads per month.   In reliance thereon, Plaintiff provided the necessary equipment and employees to generate that amount of production per month, but Defendant never met that goal.   Plaintiff had generated over 300 loads in the deck available to Defendant. However, the most that Defendant ever hauled in one month was 255 loads in May, 2019.   From October-July, Defendant only hauled an average of 82 loads per month. This resulted in a loss of income for Plaintiff from $230,000-340,000 per month to less than $60,000.

15.	In addition to the damages claimed herein, Plaintiff alleges damages caused by Defendants' inducement to Plaintiff to incur debt with Bank of the Pacific, which is believed to be Defendant's bank, for the acquisition of specialized equipment to work in Alaska.

16.	Defendants had continued to tell Plaintiff that it needed to purchase equipment from Defendants in order to do the work needed to be done.   Plaintiff did in fact purchase items of equipment from Defendants, but much of the equipment proved to be defective and non-workable.

17.	Defendants continued to encourage Plaintiff to hurry up and come to Alaska to begin work, because their mill "would run out of logs" if Plaintiff did not do so.   Plaintiff told Dahlstrom that they could purchase another item of equipment if Dahlstrom could assure that his bank would give Plaintiff financing therefore.   Plaintiff therefore incurred over $100,000 in debt which it otherwise would not have done.

18.	Defendants also promised that they would provide a "lowboy" trailer for hauling equipment to and from job sites.   Defendants did in fact tender a lowboy trailer but could not procure a title therefore.   Moreover, that trailer was too wide for the jobsite. Plaintiff offered to haul its own lowboy trailer there, but Defendants said that they would provide Plaintiff with such a trailer.   As a result, Plaintiff sold its lowboy trailer to another.   However, just before Plaintiff was to leave for Alaska, Dahlstrom told Plaintiff that the trailer he had originally thought of using would not work and Plaintiff would have to bring their own trailer.   Since Plaintiff had sold its trailer in reliance on Dahlstrom's

representations, they had to find another lowboy trailer and use funds from its operating line to pay for it.

19. Plaintiff had been promised work by Defendants for ten years if they would come to Alaska promptly. In reliance thereon, Plaintiff hired subcontractors to finish its Idaho jobs, expended substantial sums to move equipment to Alaska, and became deeper in debt to Bank of the Pacific for debt that it did not need to incur due to Defendant's subsequent breaches of the contract.

20. Thereafter, with the poor hauling provided by Defendants and the refusal to allow Plaintiff to haul its own logs to try and make up the shortfall, Plaintiff did not have sufficient funds to pay off the line of credit with Bank of the Pacific.

21. Plaintiff advised Defendants in July, 2019, that it was taking a month off to allow Defendants to get enough trees cut and trucks available to haul them.

22. However, thereafter, Bank of the Pacific called the Plaintiff's notes, would not renew the lines of credit, and began repossession proceedings on the equipment in Alaska.

23. Plaintiff is going to have to sell equipment to pay Bank of the Pacific to save the remainder of its operation, all due to Defendants' failure to perform their obligations under the contract, and all to the Plaintiff's damages as may be proved at trial.

24. For purposes of default, the amount of damages claimed by Plaintiff is over $630,000.

25. In addition, Plaintiff has filed Claim No. 8 in Plaintiff's Chapter 11 case and claimed offsets against Plaintiff. Plaintiff requests the Court to determine the validity of any claims of Defendant against Plaintiff and deny the same.

26. As this is a commercial transaction, Plaintiff is entitled to reasonable attorneys' fees and all costs of this litigation.

WHEREFORE, Plaintiff prays judgment against Defendants for their breaches of contract, misrepresentation, and failures of presupposed conditions, in the amount of $630,000 for purposes of default, together with reasonable attorneys' fees and costs of suit, and for such other relief as to the Court may seem just.

Dated this 13th day of July, 2020.

LAW OFFICES OF D. BLAIR CLARK PC


/s/ D. Blair Clark
by_____
D. Blair Clark
Attorneys for Plaintiff